# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMY HODGE, Parent and Next Friend
of JERRY HODGE, a Minor,

        Plaintiff,

vs.                                 No. 98-CIV-1450 BB/JHG

S.T. LYND, Deputy Sheriff of Lea County,
and JOHN GATES, Sheriff of Lea County,
acting in their official capacity with LEA
COUNTY, NEW MEXICO,

        Defendants.

## <u>OPINION</u>

THIS MATTER comes before the Court for consideration of the merits, in a somewhat
unusual procedural posture. The parties have submitted a set of stipulated facts and ask this
Court to render its decision on the basis of those facts. The Court has reviewed those stipulated
facts, the parties' briefs, and the relevant law. For the reasons set forth below, the Court will find
in favor of Plaintiff and set the matter of damages for an evidentiary hearing or further submission
of stipulated facts.

## FACTS

Plaintiff's son ("Jerry") is a high-school-age minor. On August 8, 1998, he and several
friends attended the Lea County Fair and Rodeo at the Lea County Fairgrounds. The Fairgrounds
are owned by Lea County, and the Fair and Rodeo is operated under the direction of the Lea
County Fair Board. The Fair Board hires the Lea County Sheriff's Department to provide
security during the fair, which is an annual event. The Fair and Rodeo is advertised and promoted

as a family event, and the Fair Board attempts to provide an environment where families with children feel comfortable.  Toward that end, the Fair Board instructed the Sheriff's Department that there should be zero tolerance for gang activity at the fair, and no tolerance for inappropriate behavior.  The general public is admitted to the fair only upon payment of an admission fee.  At each entrance to the fairgrounds, a sign is posted warning that no alcohol or weapons are permitted inside the fairgrounds, and that all individuals and their personal property are subject to search.  No sign warns that certain styles of dress will not be permitted in the fairgrounds.

The Sheriff's Department, while providing security for the Fair and Rodeo, patrols the fairgrounds regularly.  When deputies observe inappropriate conduct, such as foul language, intoxication, or loud and boisterous conduct, they ask the individual to refrain from such activity. If the activity continues, the individual engaging in the activity is escorted off the premises and is not allowed to return to the fairgrounds that night.

Prior to the 1998 Lea County Fair and Rodeo, the Sheriff's Department received intelligence reports indicating that wearing baseball hats backward could be a gang symbol.  This method of wearing caps backward, however, was also a common fashion among high school students in Hobbs and Lovington, New Mexico, the two largest communities in Lea County. Neither Jerry nor any of his companions on the night of August 8, 1998, were members of a gang or otherwise affiliated in any way with a gang, and the Sheriff's Department had no information to the contrary.   On August 8, 1998, the students entered the fairgrounds wearing their baseball caps backward.

Defendant Lynd ("Lynd"), a sheriff's deputy, was patrolling the fairgrounds that night.  He encountered several groups of young men and women, wearing baggy clothes and backward

baseball caps.  He viewed such clothing as similar to that worn by gang members, and asked the members of such groups to turn their caps around.  At around 8:00 p.m., Lynd encountered Jerry and his friends, who at all times while on the fairgrounds were acting in a lawful manner.  Lynd had no indication they had committed any violation of law.  However, he stopped them and asked them to turn their caps around, explaining the Fair's zero-tolerance policy regarding gang activity.  Jerry appeared displeased with this request, and Lynd told Jerry that if he was caught wearing his cap backward again, he would be escorted to the gate and not allowed to return for the rest of the night.

Jerry and his friends turned their caps around and went on their way.  A short time later, however, Lynd encountered the group again, and Jerry's cap was backward.  Lynd asked Jerry why he had turned the cap around, and Jerry replied that he had not thought Lynd would see him again.  Lynd escorted Jerry to the gate and off the premises, telling him he could return to the fairgrounds the next night, but not this night.  Jerry waited off the premises for about forty-five minutes, and then paid a second admission fee and re-entered the fairgrounds to find his friends, so that he could get a ride home to Hobbs.

Thereafter, Lynd came upon Jerry with a group of young men and women.  Lynd arrested Jerry for criminal trespass, handcuffed Jerry, and took him to the fairgrounds office.  Jerry remained in handcuffs for about thirty minutes while he was waiting for the transport vehicle to arrive at the office.  When another deputy arrived with the transport vehicle, Jerry asked this deputy to loosen the handcuffs.  The deputy did so, and when they arrived at the Lea County Sheriff's Department building, the handcuffs were removed entirely.  Jerry's father was contacted, and arrived about thirty minutes later to retrieve his son.  He took Jerry to a local hospital's

emergency room, where he was seen by a physician for abrasions and bruises caused by the handcuffs. The Sheriff's Department forwarded the criminal-trespass accusation to the district attorney's office for prosecution. That office, however, declined to prosecute Jerry on any charge.

Subsequently, Jerry (through Plaintiff, his father) filed this lawsuit, alleging violation of his civil rights, false arrest, and battery. Jerry requests money damages as well as injunctive relief, asking that the County be precluded from enforcing its views concerning appropriate dress at events such as the Fair.

**DISCUSSION**

**Preliminary Discussion of Legal Issues Presented by this Case**

The parties' briefs discuss several issues which, in the Court's view, fail to consider the critical legal questions necessary to properly analyze the case. For example, Defendants (collectively, "the County") argue extensively that Jerry's conduct was not protected under the First Amendment. The County maintains that one's choice of clothing or appearance is not a form of protected speech, at least in this case where Jerry's cap apparently contained no written communication or symbols of any kind. The Court agrees with this analysis. *See Stephenson v. Davenport Community Sch. Dist.*, 110 F.3d 1303, 1307, fn. 4 (8th Cir. 1997) (student's tattoo was simply a form of self-expression, not speech protected by First Amendment, where tattoo was not intended to communicate any religious, political, or other particularized message); *Jackson v. Dorrier*, 424 F.2d 213, 217 (6th Cir. 1970) (hair length is not an expression within the concept of free speech); *Bivens v. Albuquerque Pub. Schs.*, 899 F.Supp. 556, 560-61 (D.N.M. 1995) (wearing sagging pants is not speech for First Amendment purposes); *Olesen v. Bd. of Educ.*, 676

F.Supp. 820, 822 (N.D.Ill. 1987) (in order to claim First Amendment protection student must demonstrate clothing was intended to convey a message; earring did not qualify). As the Court discusses below, however, the lack of First Amendment protection for Jerry's choice of dress is not dispositive of Jerry's claim.

Jerry's brief, in turn, also argues constitutional principles that are not applicable to the circumstances of this case. Jerry asserts broadly that the County had no right to tell him how to wear his cap, but grounds his assertion primarily on Fourth Amendment search-and-seizure law. Jerry points out that Deputy Lynd had no suspicion that Jerry had committed a crime or was committing a crime, when he first approached Jerry. Absent reasonable suspicion, argues Jerry, Deputy Lynd had no right to tell him to turn his cap around or to remove him from the premises when Jerry defied that order. Furthermore, since Jerry's exclusion from the premises was illegal, as it was not based on any suspicion a crime had been committed, Jerry maintains his subsequent arrest for re-entering the fairgrounds was illegal as well.

Jerry's argument is correct in at least one respect. If Lynd's order excluding Jerry from the fairgrounds was unconstitutional, Jerry could not validly be arrested for non-violently disobeying that order. *See, e.g.*, *Wright v. Georgia*, 373 U.S. 284, 291-92 (1963) (a person cannot be punished for failing to obey the command of a police officer if that command is itself violative of the Constitution). Therefore, if Deputy Lynd's initial order excluding Jerry from the Fair was unlawful, the subsequent arrest was also unlawful.

Jerry's next contention, however, that Lynd had no right to approach him, ask him to turn his cap around, and then exclude him from the premises, absent reasonable suspicion that a crime had been committed, would inject another faulty analytical framework into this case. This is not a

search case, or a stop-and-frisk case. Deputy Lynd was not investigating possible illegal activity during his initial encounter with Jerry. Instead, he was enforcing the County's rules governing conduct at the Fair. In particular, he was enforcing an informal dress code established by his superiors as part of the zero-tolerance anti-gang-activity policy created by the County. Therefore, the Fourth Amendment was not implicated in any fashion during Lynd's first two encounters with Jerry. The true question in this case is whether the County could constitutionally require Jerry to wear his cap facing forward rather than backward while he attended the Fair. Thus, the proper inquiry is whether Deputy Lynd, as the County's agent, could enforce the County's rules by excluding Jerry from the Fair premises as a result of Jerry's refusal to abide by Lynd's command that he wear his cap facing forward. No issue of reasonable suspicion or probable cause is presented by this question. Instead, as discussed below, the issue requires analysis of the County's interest in enforcing a particular dress code at the Fair, as well as Jerry's liberty interest in choosing his mode of dress.

The fact that Jerry's choice to wear his cap backward was not protected by the First or Fourth Amendments does not mean it lacked all constitutional protection. A number of federal courts have held that an individual's choice of personal dress or appearance is a liberty interest protected under the Due Process Clause.[1] Citing examples of draconian governmental action

---

[1]*See Stephenson,* 110 F.3d at 1307 (school district's regulation banning gang-related activities such as displaying gang symbols implicated plaintiff's liberty interest governing her personal appearance); *Rathert v. Village of Peotone*, 903 F.2d 510, 514 (7th Cir. 1990) (in Seventh Circuit, choice of appearance is an element of liberty); *DeWeese v. Town of Palm Beach*, 812 F.2d 1365, 1367 (11th Cir. 1987) (liberty interest in personal dress is constitutionally protected, as is right of citizen to choose mode of personal hair grooming); *Domico v. Rapides Parish Sch. Bd.*, 675 F.2d 100, 101 (5th Cir. 1982) (there is constitutional liberty interest in choosing how to wear one's hair); *East Hartford Educ. Ass'n v. Bd. of Educ. of the Town of East Hartford*, 562 F.2d 838, 842 (2d Cir. 1977) (liberty interest within the Fourteenth Amendment

from Manchu China to Czarist Russia,[2] these courts have held, in essence, that governments have no business telling their citizens what to wear or how to look, unless there is a legitimate reason for doing so.  The Tenth Circuit has not decided this issue yet, nor has the Supreme Court, but both have assumed the existence of such a liberty interest in personal appearance, while deciding cases on other grounds.  *See Kelley v. Johnson*, 425 U.S. 238, 244 (1976); *Grusendorf v. City of Oklahoma City*, 816 F.2d 539, 542-43 (10th Cir. 1987) (applying *Kelley* and its liberty assumption to case involving rule banning firefighters from smoking while off duty).  This Court agrees that deciding what clothes to wear and what appearance to present to the rest of the world are personal decisions, constitutionally protected from arbitrary governmental interference.  The Court therefore adopts the position espoused in the cases cited above, and holds there is a liberty interest in one's choice of clothing, grooming, and other aspects of personal appearance, under the Due Process Clause of the United States Constitution.  The proper analysis to apply in this case, therefore, concerns the possible deprivation of this liberty interest rather than any interference with Jerry's First or Fourth Amendment rights.

### Nature and Extent of County's Right to Exclude Individuals from the Fair

---

was involved in case where teacher challenged dress code requiring him to wear a necktie); *Lesser v. Neosho County Comm. College*, 741 F.Supp. 854, 861 (D.Kan. 1990) (college students have a generally recognized liberty interest in the control of their personal appearance).

[2]In China, following the Manchu invasion of 1644, the conquerors required the population to wear a prescribed hair style and prescribed clothing, and killed those who did not obey; in Russia, also in the 17th century, Peter the Great imposed a heavy tax on beards that had religious significance for Russian Orthodox men, in an attempt to force a more Western lifestyle on his country.  *See East Hartford*, 562 F.2d at 842.  "Forced dress...humiliates the unwilling complier, forces him to submerge his individuality in the 'undistracting' mass, and in general, smacks of the exaltation of organization over members, unit over component, and state over individual."  *Karr v. Schmidt*, 460 F.2d 609, 621 (5th Cir. 1972) (Wisdom, J., dissenting).

Although similar cases have been filed concerning similar private amusement facilities,[3] the Court has been unable to locate any reported opinions discussing a government entity's right to exclude individuals from government-sponsored entertainment events such as the Fair, or to impose a dress code in connection with such events. It is therefore necessary to determine what analogous principles of law should apply to this case. The County compares its position to that of a private landowner, arguing that it has the right to establish rules of conduct at the Fair, and to exclude individuals who violate those rules, to the same extent as a private landowner has a right to exclude unwelcome persons. The Court cannot agree with this contention.

Fairgrounds that are open to the public, even for an admission fee, are not the equivalent of private property. The Fair in this case is operated by the government for the benefit of the general public, not for the benefit of the fair board or other individuals. Courts have recognized this distinction under the arguments advanced by the parties. In the First Amendment context, the Supreme Court has held that a state fair is a "limited public forum," rather than a nonpublic forum. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 651-55 (1981). The *Heffron* holding has been applied to a county fair to find such a fair is also a limited public forum. *See Mood for a Day, Inc. v. Salt Lake County*, 953 F.Supp. 1252, 1260 (D.Utah 1995). This principle remains true even though the state fair is operated by a quasi-public entity like the fair board. *See Bolinske v. North Dakota State Fair Ass'n*, 522 N.W.2d 426, 430-32 (N.D. 1994). It

---

[3]For a discussion of several similar cases, filed against the Six Flags/Magic Mountain amusement park located outside of Los Angeles, but settled prior to trial, see Shelan Y. Joseph, *Six Flags Magic Mountain: A Family Entertainment Park, But Only If You Wear the Right Clothes*, 16 Loy.L.A. Ent. L.J. 359 (1995). A similar suit filed against Great America, another California amusement park, based on "gang profiling" is discussed in Margaret M. Russell, *Entering Great America: Reflections on Race and the Convergence of Progressive Legal Theory and Practice*, 43 Hastings L.J. 749, 759-60 (1992).

is also relevant under Fourth Amendment principles that the Fair is held at government-owned entertainment facilities, with security being provided by on-or-off-duty law enforcement officers. *See Jacobsen v. City of Seattle,* 658 P.2d 653, 656 (Wash. 1983) (suspicionless searches imposed as condition of entry to rock music concerts invalidated by court); *State v. Carter*, 267 N.W.2d 385, 386-87 (Iowa 1978) (same); *compare Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442, 1446-47 (10th Cir. 1995) (no state action, and therefore no civil-rights claim for unlawful search, where rock concert was held at government-owned facility but facility was rented to private entity that sponsored event, and searches were performed by private company). It is clear the Fair's right to exclude is not coextensive with that of a private property owner.

While this Court does not accept the First or Fourth Amendment as the proper tool for the disposition of this case, the public, or nonpublic, forum categorization of property that occurs in First Amendment cases is a useful analytical tool. *See Hawkins v. City and County of Denver*, 170 F.3d 1281, 1286-87 (10th Cir. 1999). Governments control a wide variety of properties with a wide variety of uses. Just as a government's authority to restrict individual speech varies, depending on the nature of the forum, so also should a government's authority to exclude individuals from areas or facilities under its control vary, depending on the nature of the property.

For example, where public streets or parks are concerned, the government's authority to exclude persons is weakest, and a correspondingly high governmental interest must be shown before an individual may be singled out and forced to leave, or prevented from obtaining access to, the area. Such areas are analogous to the public fora of First Amendment jurisprudence, where the government's interest in controlling speech is least strong. *See United States v. Grace*,

461 U.S. 171, 177 (1983); *Hawkins; see generally* Robert C. Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 U.C.L.A. L.R. 1713 (1987). Even in these areas, however, where an individual is violating a law, or serious safety concerns are present, some right to limit access should exist. *See, e.g., United States v. Chalk*, 441 F.2d 1277, 1282 (4th Cir. 1971) (approving temporary night-time curfew imposed as a result of serious civil unrest, despite impact on constitutional rights); *Moorhead v. Farrelly*, 727 F.Supp. 193, 200-01 (D.V.I. 1989) (approving temporary curfew imposed to prevent looting and other illegal activity following Hurricane Hugo).

At the other end of the spectrum are publicly-owned facilities designated as limited-access areas, into which only authorized individuals are admitted. Examples of these facilities are myriad, and include properties such as military bases[4] or jail and prison property,[5] where security must be maintained for the institution to fulfill its purpose; or schools,[6] where the facility's purpose could be disrupted by allowing unlimited access to the general public or by unlimited speech. In these areas, the governmental interest in excluding unwanted individuals is at its zenith. These areas are therefore comparable to the non-public fora discussed in First Amendment cases, in which individuals' free-speech rights are weakest.

---

[4] *Brown v. Grines*, 444 U.S. 348, 354-57 (1980); *Greer v. Spock*, 424 U.S. 828, 840 (1976).

[5] *Adderley v. Florida*, 385 U.S. 39, 46-48 (1966).

[6] *Phoenix Elementary Sch. Dist. v. Green*, 943 P.2d 836, 839 (Az.App. 1997) (school is nonpublic forum, in part because it closely regulates presence on campus of non-students); *cf. Slotterback v. Interboro Sch. Dist.*, 766 F.Supp. 280, 293-94 (E.D.Pa. 1991) (for students, school is limited public forum in which speech may be reasonably regulated).

The Fair, and other publicly-sponsored events such as state university basketball games or music concerts, present a middle ground. These entertainment events are open to any member of the general public who can pay the admission, and access to the events is not restricted to authorized persons, as it is in the case of limited-access facilities. On the other hand, the events are organized and presented for particular purposes or combinations of purposes. Events such as the Fair or the state fair, for example, provide (among other things): (1) entertainment in the form of the rodeo and the carnival rides; (2) education, through the exhibits; and (3) competition in animal husbandry and other skills, in the awards for best livestock, baking contests, and other competitions. *See Mood for a Day*, 953 F.Supp. at 1261. The government entity sponsoring a fair or concert has an interest in ensuring that the particular purposes for the event are met, and in excluding individuals who are disrupting the event in some manner or who threaten to do so. This is so even if the individuals are not in violation of any law, but are merely violating the rules of the event. Therefore, the government has more authority to exclude individuals from events such as the Fair than from a public street or park.[7]

[7]As discussed below, the nature of the forum comes into play in the rational-relationship test when analyzing the legitimacy of the governmental interest in controlling certain activity.

**Extent and Nature of Jerry's Liberty Interest**

As noted above, individuals do have a liberty interest in the way they dress and in their personal appearance. This liberty interest, however, is not without limits. Where there is a legitimate governmental interest in regulating individuals' appearance or choice of clothing, the Constitution is not offended by such regulation. Examples of such legitimate governmental interests are numerous. Dress or appearance codes for employees of public schools, for example, have often been upheld against constitutional challenge. *See, e.g., Domico*, 675 F.2d at 102; *East Hartford*, 562 F.2d at 859-60. The same is true, albeit with more exceptions, of dress or appearance codes for public-school students. *See Domico*, 675 F.2d at 102 (discussing Fifth Circuit case law concerning hairstyle regulation in public schools); *Freeman v. Flake*, 448 F.2d 258, 260-61 (10th Cir. 1971) (holding courts should not substitute their beliefs concerning appropriate hair length for the judgment of school boards); *Bivens v. Albuquerque Pub. Schs.*, 899 F.Supp. 556, 561 (D.N.M. 1995) (upholding dress code against First Amendment challenge); *Phoenix Elementary Sch.*, 943 P.2d at 839-40 (same); *but see Arnold v. Carpenter*, 459 F.2d 939, 943 (7th Cir. 1972) (school dress code's hair-length provision did not have reasonable relation to a purpose within the school's competence). This is due to the strong interest in promoting a positive learning environment and to the recognized fact that students' privacy rights, while not left at the schoolhouse door, are certainly reduced when they enter a public school. *See Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995) (public school students are in unique constitutional position enjoying less than the full liberty protection afforded those not in school; they do not surrender their constitutional rights at the schoolhouse gate, but the nature of those rights is what is appropriate for children in school); *Karr v. Schmidt*, 460 F.2d 609, 615-16

(5th Cir. 1972) (hair length regulation in school context does not violate substantive due process; students' liberties are already restricted in schools). In addition, dress and personal-appearance requirements for non-school-related government employees have survived challenges by disgruntled workers. *See Kelley*, 425 U.S. at 246; *Rathert*, 903 F.2d at 514-15.

It is apparent under current case law that one's liberty interest in personal dress or appearance, while commonly recognized by courts, is less significant than other, more fundamental rights. *See Domico*, 675 F.2d at 102, fn. 1 ("The plaintiffs cannot claim that the right to choose one's hairstyle is a fundamental right whose deprivation will draw stricter scrutiny from the courts."); *Karr*, 460 F.2d at 615 (individual liberties may be ranked in a spectrum of importance; at one end are the great liberties such as speech, religion, and marital privacy; at the other are lesser liberties such as the liberty at stake in hairstyle regulation case). Courts recognizing the liberty interest in personal dress and appearance have almost uniformly applied the rational-basis test, rather than the more stringent intermediate-scrutiny or strict-scrutiny tests, to determine the validity of state action infringing that liberty interest. *See Domico* (decided in context of school dress code applied to school employees)*; see also DeWeese*, 812 F.2d at 1367 (municipal ordinance forbidding men from appearing shirtless); *Rathert*, 903 F.2d at 514 (discipline meted out to police officers for wearing ear studs while off duty). With these general principles in mind, the Court turns to an analysis of the particular facts of this case.

### Jerry's Liberty Interest Versus the County's Action in this Case

The Court will first examine whether the County has any legitimate interest in imposing a dress code upon patrons at the Fair, given the nature of that event. As noted above, the proper constitutional test to apply in this case, with respect to the concept of a dress code in general, is

the rational-basis test.[8]  The first requirement in applying this test is to define the government's goals carefully.  As the Supreme Court and other courts have noted, in substantive-due-process cases it is important to narrowly define the asserted right, since at some level of generality any right can be deemed significant.  *See, e.g., Hutchins v. District of Columbia*, 188 F.3d 531, 538 (D.C. Cir. 1999) (in assessing curfew placed on minors, court states that claimed right cannot be defined broadly as "free movement of people"; instead, claimed right is right of minor to be on streets at night without adult supervision).  Conversely, at some level of generality almost all government interests can be deemed legitimate.  The County's asserted interest in this case is to ensure a family-friendly environment at the Fair, and to exclude those that might unduly disrupt that environment.  As stated this goal is quite broad.  In the specific context of this case, however,

---

[8]A number of courts and Supreme Court Justices have advocated the use of a sliding-scale or balancing type of analysis for substantive-due-process cases involving liberty interests that are constitutionally protected, but do not rise to the level of fundamental interests deserving the protection of strict scrutiny.  *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 765-73 (1997) (Souter, Justice, concurring, discussing a substantive-due-process analysis that would balance the interests of the state with the interests of the individual in determining whether legislation has impermissibly infringed on a liberty interest).  At present, however, such a "rational continuum" test has not been adopted by the full Supreme Court.  *See id.* at 721-22 (rejecting Justice Souter's approach).  Therefore, if a fundamental right is not involved in the case, the seemingly all-or-nothing rational-basis test is the only applicable analysis.  *See id.* at 728.  Of course, even in the rational-relationship test there is room for some flexibility.  For example, under the rational-basis test the government's rule or regulation must be rationally related to a *legitimate* government interest.  In assessing the legitimacy of that interest, as the Court does in this case, the countervailing liberty interests of the citizenry, given the circumstances of each case, can be taken into account.  Courts often appear to have done this when applying the rational-basis test in substantive-due-process cases, although they have not always explicitly acknowledged the process.  *Cf., e.g., Lansdale v. Tyler Junior College,* 470 F.2d 659, 662-63 (5th Cir. 1972) (holding that at the college level, unlike the high school level, an adult's constitutional right to wear his hair as he chooses supersedes the state's right to intrude by imposing an "appearance code" on would-be junior college students); *City of Chicago v. Wilson*, 389 N.E.2d 522, 524-25 (Ill. 1978) (rejecting several seemingly rational justifications for a statute outlawing cross-dressing in public).

the County's actual objective is to prevent patrons from wearing clothing that, simply from the nature of the clothing, poses a threat to the family-friendly atmosphere the County is attempting to foster at the Fair. Therefore, the Court must examine the legitimacy of that interest.

Courts that have addressed the issue of government-imposed dress codes have had varied responses, which have usually depended on the nature of the arena in which the government sought to regulate. Ordinances attempting to regulate what the general public wears, on public streets and in other public areas, have not fared well. *See DeWeese,* 812 F.2d at 1369-70 (finding no rational basis for town ordinance precluding men from appearing in public without a shirt); *Wilson* (same, for ordinance outlawing cross-dressing in public); *City of Harvard v. Gaut*, 660 N.E.2d 259, 263-64 (Ill.App. 1996) (ordinance prohibiting wearing of gang colors, emblems, or other insignia). As these ordinances imposed criminal punishments on individuals, they represented the strictest governmental response to the individuals' choice of dress. They also applied in locations from which, as discussed above, the government's ability to exclude members of the public is at its weakest.

In more restricted environments, such as schools and other instances of government employment, as noted above, dress codes or appearance requirements in general have often been upheld against constitutional challenge, although a significant number of courts have rejected such requirements where students are concerned. *See Rathert; Domico; East Hartford; Karr; Freeman; Bivens; but see Arnold; Alabama & Coushatta Tribes v. Trustees of the Big Sandy Ind. Sch. Dist.*, 817 F.Supp. 1319, 1333 (E.D.Tex. 1993) (hair length regulation in school held unconstitutional due to burden on religious freedom, parents' rights; regulation not a valid means of achieving objectives of discipline and respect for authority). Moreover, even courts which

recognize the authority to enforce a dress code require that it be targeted at a known problem. *See Jeglin v. San Jacinto Unified Sch. Dist.*, 827 F.Supp. 1459, 1460-61 (C.D.Cal. 1993) (upholding ban on professional sports apparel in high school but striking down same limits on junior high and elementary students since no gang activity shown to exist at those levels); *see also McIntire v. Bethel Sch., Indep. Sch. Dist. No. 3*, 804 F.Supp. 1415, 1427-29 (W.D.Okla. 1992) (school district must show T-shirts with alleged reference to liquor distributor were disruptive).

As previously noted, cases such as the one currently before the Court are in a middle zone of interests, involving an event that is open to the general public but is put on for a particular purpose. The Court finds that a governmental entity sponsoring an event such as the Fair has a legitimate interest in fostering a non-violent, family atmosphere, because this atmosphere is consistent with the purpose of the event being sponsored.[9] In connection with that interest, the Fair has the authority to impose rules of conduct designed to advance this goal. Since the Fair is unlike other events in which a particular mode of dress is part of the purpose of the event, the County had no legitimate interest in enforcing a dress code requiring a particular style of clothing. However, the Court finds the County did have a legitimate interest in imposing a dress code banning clothing that other patrons would find threatening, or that could potentially trigger angry

---

[9]Government entities should have the ability to sponsor different types of events and to establish rules of conduct that comport with the purposes of these different events. For example, if the County were sponsoring a black-tie affair as an entertainment event, the County would have a legitimate interest in enforcing a black-tie atmosphere, because this atmosphere is consistent with the purposes of such an event. Alternatively, if the County were to sponsor a professional wrestling extravaganza, the purposes of the event would be quite different, as would the atmosphere sought to be promoted.

or even violent responses from those other patrons.  Such clothing would be inimical to the family-oriented, safe atmosphere that was part of the purpose for the Fair.

The next question in this case, however, is whether the dress code established by the Sheriff's Department, under authority delegated by the Fair Board, is rationally related to the County's legitimate concern.  At first consideration, it might seem obvious that it is.  The deputies on duty were instructed, in essence, to prevent anyone from wearing gang-related attire at the Fair, and it might be supposed that gang-related attire is inconsistent with a family-oriented, safe atmosphere.  The difficulty in this case, however, is that the purported gang-related attire banned by Deputy Lynd was the same attire as that worn by a substantial number of non-gang-member youths.  According to the stipulated facts, wearing one's baseball cap backward is a common mode of dress among young people in Hobbs and Lovington.  Thus, there is no indication in the stipulated facts that a member of the general public, seeing Jerry and his friends wearing their caps backward, would have thought they were gang members and would have reacted fearfully or in a confrontational manner.  Instead, under the stipulated facts it is more likely that Fair patrons, upon seeing Jerry and his friends, would have viewed them as dressed in the same manner as their sons and daughters and other local youth.  It is significant that the County did not attempt to ban a particular style of cap known to the public, or to rival gangs, to be indicative of membership in a particular gang.  Instead, the County (through the Sheriff's Department) banned a general style of dress shared by many members of the community, based merely on "intelligence reports" that the style "could" be indicative of gang activity.  The stipulated facts reveal no reason why a rival gang member would have wanted to confront or attack Jerry due to the way he wore his cap, and reveal no reason a typical non-gang Fair patron would have feared him or been intimidated

because he wore his cap backward. For this reason, the Court finds the dress code barring Fair patrons from wearing their caps backward was not rationally related to the County's legitimate goal of preventing the wearing of clothing which, in and of itself, would threaten the safe, secure, and family-oriented atmosphere the County was attempting to establish at the Fair.

There is yet another reason the County's anti-gang dress code was constitutionally unenforceable against Jerry. As noted above, school dress and appearance codes have been upheld against constitutional challenge in a number of instances. However, dress codes that generally ban "gang-related apparel," or are phrased in similar general anti-gang terms, have not received approval from the courts. Dress codes or city ordinances banning clothing or appearance in such general terms have been struck down, usually on vagueness grounds. *See, e.g., Stephenson,* 110 F.3d at 1309-11*; Chalifoux v. New Caney Ind. Sch. Dist.*, 976 F.Supp. 659, 669 (S.D.Tex. 1997)*; City of Harvard.* For example, in *Stephenson*, the Eighth Circuit quoted studies pointing out that the term "gang" is "notoriously imprecise," and that the meaning of "gang activity" is as varied as the background and perspectives of those attempting to define it. 110 F.3d at 1309. The Eighth Circuit determined the term "gang" was fatally vague, and found use of that term in the dress code allowed school administrators and local police unfettered discretion to decide what represents a gang symbol. *Id.* at 1310. Finally, the Eighth Circuit pointed out that "gang symbols" include common jewelry, clothing, and words, such as color combinations. The facts that the dress code would proscribe much innocent conduct, that unfettered discretion was accorded the authorities enforcing the code, and that the code did not define proscribed conduct in any way other than the general term "gang activity," led the Eighth Circuit to hold the dress code void for vagueness.

Similarly, in *Chalifoux*, the district court invalidated a school dress code that banned "gang-related apparel." 976 F.Supp. at 669. The court relied on the lack of a sufficient definition for that term, which meant the dress code provided excessive discretion to law enforcement officials to decide the parameters of the ban on "gang-related apparel." Furthermore, the court found the dress code infringed on some students' First Amendment free-exercise rights, as it was interpreted to proscribe the wearing of rosaries outside one's clothing. *Id.* For these reasons, the court found the prohibition on gang-related apparel void for vagueness. *See also City of Harvard*, 660 N.E.2d at 262-63 (invalidating city ordinance on overbreadth grounds, because the ordinance outlawing the wearing of "known gang colors, emblems, or other insignia" banned a substantial amount of protected speech, given the fact that "gang colors" and "gang clothing" included the official colors of the local high school, Chicago Bulls jackets, and religious jewelry such as the Star of David).

It is apparent the informal dress code established by the Sheriff's Department for the Fair on the basis of the County's "zero gang tolerance" rule, which banned the wearing of clothing that "could be an indicator of gang activity," suffers from the same vagueness problems as the dress codes and ordinance involved in *Stephenson, Chalifoux,* and *City of Harvard*. There is nothing in the zero-tolerance rule that in any way specifies what is meant by gang activity, gang symbols, or gang-related apparel. Due to this lack of specificity, enforcement of the dress code is left to the unfettered discretion of individual officers such as Deputy Lynd. Finally, the particular example of gang-related activity involved in this case, wearing one's baseball cap backward, is a mode of dress common to many non-gang-affiliated individuals in the area, making it difficult to determine where innocent conduct ends and gang-related activity begins. For these reasons, the Court finds

the dress code created for the Fair is unconstitutionally vague and could not be the lawful basis for ejecting Jerry from the Fair or preventing him from returning. *Cf. City of Chicago v. Morales*, 119 S.Ct. 1849, 1859-63 (1999) (invalidating a city ordinance prohibiting "criminal street gang members" from "loitering" with one another or with other persons in any public place; ordinance was invalid due to its impact on liberty to move about or stay in one place, as well as vagueness resulting from lack of clear standards and great amount of discretion afforded law enforcement officers).

### Qualified Immunity

The County argues that, if a violation of Jerry's constitutional rights is found, the doctrine of qualified immunity should be applied because Jerry's rights were not clearly established at the time of Jerry's arrest. Preliminarily, the Court notes the qualified-immunity claim does not apply to Plaintiff's request for injunctive relief. *See Lemmons v. Law Firm of Morris and Morris*, 39 F.3d 264, 267 (10th Cir. 1994) (qualified immunity does not preclude prospective injunctive relief except in rare circumstances). In addition, the caption of the complaint filed in this case indicates Plaintiff is suing the two individual Defendants only in their official capacities. If that is the case, the qualified-immunity doctrine has no applicability, because the doctrine only protects government employees who are being sued in their individual capacities. *See Moore v. City of Wynnewood*, 57 F.3d 924, 929, fn. 4 (10th Cir. 1995) (defense of qualified immunity only applies to defendant in his individual capacity).

However, since Jerry's response to the request for qualified immunity does not indicate whether this action is brought against Defendants in their individual capacities as well as their official capacities, the Court will decide the merits of the qualified-immunity issue. To overcome

a claim of qualified immunity, there must first of all be a showing that the defendant violated a constitutional right. *See Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). That requirement is satisfied in this case, as a result of the Court's finding that Jerry's liberty interest in dress and appearance was violated when he was ejected from the Fair due to the way he wore his cap, and then was arrested for disobeying the unconstitutional ejection order.

The second hurdle presented by a qualified-immunity claim is the necessity of establishing the right was "clearly established" at the time of the conduct at issue. *See id.* The "clearly established" factor has two components -- first, an examination of case law to determine what courts have held concerning the particular constitutional right in question; and second, an examination of the specific facts of the present case, to determine whether a reasonable government official, aware of the case law, would have understood that what he was doing violated that constitutional right. *See id.* It is not necessary that the very action in question have previously been held unlawful, but in light of existing law the unlawfulness of the action must be apparent. *See id.*

The Court finds the law applicable to this case was clearly established as of August 7, 1998, the date Jerry was ejected and then arrested. Regarding the existence of a liberty interest in dress and appearance, as noted above a substantial majority of the courts considering the issue had held that such a liberty interest does exist. *See, e.g., Stephenson; Rathert; DeWeese; East Hartford; Albright* (law is clearly established even if there is no Tenth Circuit opinion on point, if weight of authority from other jurisdictions shows law is as plaintiff maintains). Although no case has directly considered the constitutionality of a dress code in the specific context of a public entertainment event, as discussed above there was case law indicating the invalidity of dress codes

phrased in general terms such as the "zero gang tolerance" policy enforced by Deputy Lynd in this case. It would therefore have been apparent to a reasonable law enforcement officer that excluding Jerry from the Fair, due to his insistence on wearing his cap in a style common to many non-gang-affiliated youths in Lea County, violated his constitutional rights. In sum, the contours of Jerry's constitutional right were clearly established as of August 7, 1998, and the Court will deny Defendants' request for qualified immunity. *See, e.g., Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1241 (10th Cir. 1999) (where concept of supervisory liability and danger-creation doctrine were both clearly established at time of incident, contours of plaintiff's right were clearly established and qualified immunity would be denied, even though case involved unusual fact situation).

**Remedy**

Jerry has requested injunctive relief in this case. He requests an injunction prohibiting the County and the Sheriff's Department from allowing officers to approach Fair patrons without reasonable suspicion or probable cause that a crime has been committed. As discussed above, however, the County is entitled to promulgate appropriate rules of conduct for the Fair, and to enforce those rules even if no criminal activity is involved. On the other hand, where a liberty interest such as the right to dress as one pleases is implicated, the County's rules must be reasonably related to a legitimate interest in controlling the activity. The zero-gang-tolerance policy, as applied in the form of a dress code imposed upon Fair patrons, does not pass constitutional muster, for the reasons discussed above. The Court will therefore enter an injunction against enforcement of the unwritten dress code in its present form.

In his complaint, Jerry also requested money damages. The stipulated facts indicate he was handcuffed, held in the cuffs for thirty minutes, and suffered abrasions serious enough to require a visit to the doctor. No other facts are presented concerning his injuries. For example, there is no information concerning the dollar amount of medical bills involved in this case, if any. It is therefore difficult to assign a monetary value to the damages Jerry suffered. The Court considers the fact that Jerry's injuries were apparently slight and not permanent. The Court also, however, considers the fact that it must certainly have been traumatic for a teenager to be arrested in front of his friends, handcuffed, and held in custody. At this time, however, rather than make a decision concerning monetary damages, the Court will schedule the matter for an evidentiary hearing, or the parties may again submit the matter upon stipulated facts.

**CONCLUSION**

This case involves a seemingly trivial matter, the wearing of one's baseball cap backward or forward. However, it raises important issues concerning the extent to which government officials can regulate any activity that might be an indicator of gang presence. Courts have noted that the due process clause protects freedoms "both great and small." *See Karr*, 460 F.2d 615, fn. 12. In this case, in the County's effort to prevent any possible problems at the Fair, the County impermissibly infringed on Jerry's liberty to wear his cap as he saw fit. For this reason, the Court will find in favor of Jerry and against the County. A final judgment will be issued following resolution of the damage issue.

DATED March 14, 2000.


                        _____
                        BRUCE D. BLACK
                        UNITED STATES DISTRICT JUDGE


**ATTORNEYS**

**For Plaintiff**
C. Barry Crutchfield
Templeman and Crutchfield
113 East Washington
Lovington, New Mexico 88260

**For Defendants**
Gregory L. Biehler
Beall & Biehler, P.A.
6715 Academy Rd. N.E.
Albuquerque, New Mexico 87109